UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
GOTHAM HOLDINGS, LP,
PRIMARIUS PARTNERS LP,
PRIMARIUS OFFSHORE PARTNERS LTD.,
PRIMARIUS FOCUS LP, and
PRIMARIUS CHINA FUND LP,

           Plaintiffs,

  vs.

HEALTH GRADES, INC.,
MDB CAPITAL GROUP LLC, and
ESSEX WOODLANDS HEALTH
VENTURES,

           Defendants.
----------------------------------------------------------x

Case No. 07 CV 2563 (MGC)

ECF CASE

COMPLAINT

DEMAND FOR JURY TRIAL

      Plaintiffs Gotham Holdings, LP, Primarius Partners LP, Primarius Offshore Partners LP, Primarius Focus LP and Primarius China Fund LP allege:

## Jurisdiction and Venue

      1.    This action arises under § 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder and under § 12(a) of the Securities Act of 1933, as amended, 15 U.S.C. § 77l(a), as hereinafter more fully appears. This Court therefore has subject matter jurisdiction under 28 U.S.C. § 1331. The Court should assume subject matter jurisdiction of Plaintiffs' state law claims under the doctrine

of pendant jurisdiction because those claims and Plaintiffs' federal claims arise out of a common nucleus of operative fact.

2. Defendants each transact business and/or are found within this District. Accordingly, this Court has personal jurisdiction over each Defendant, and venue is proper under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to the claims herein transpired in New York.

## The Parties

3. Plaintiff Gotham Holdings, LP ("Gotham") is a limited partnership organized under the laws of Delaware with its principal place of business in New York City. Gotham is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

4. Plaintiff Primarius Partners LP ("Partners") is a Delaware limited partnership with its principal place of business at One Montgomery Street, San Francisco, California. Partners is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

5. Plaintiff Primarius Offshore Partners Ltd. ("Offshore Partners") is a British Virgin Islands corporation with its principal place of business at One

Montgomery Street, San Francisco, California. Offshore Partners is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

6. Plaintiff Primarius Focus LP ("Focus") is a Delaware limited partnership with its principal place of business at One Montgomery Street, San Francisco, California. Focus is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

7. Plaintiff Primarius China Fund LP ("Primarius China") is a Delaware limited partnership with its principal place of business at One Montgomery Street, San Francisco, California. Primarius China is a "hedge fund" until recently engaged in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies. Primarius China is currently in the process of winding up its affairs.

8. Defendant Health Grades, Inc. ("Health Grades") is a corporation organized under the laws of Delaware with its principal place of business in Golden, Colorado. Health Grades is, and at all relevant times has been, in the

business of "grading" and providing reports concerning the quality of hospitals, physicians, nursing homes, home health agencies, hospice programs and other health care providers.  Its customers include consumers, health plans, employers, doctors and liability insurance companies.  Health Grades trades as HGRD on NASDAQ.

9. Defendant MDB Capital Group LLC ("MDB") is a limited liability company organized under the laws of California with its principal place of business in Santa Monica, California.  MDB is in the business of providing merchant and investment banking, market research, "roadshow" and market making services.  MDB is a registered broker-dealer and a member of the National Association of Securities Dealers.

10. Defendant Essex Woodlands Health Ventures, LLC ("Essex") is a limited liability company organized under the laws of Delaware with principal places of business in Palo Alto, California, The Woodlands, Texas, New York City and London.  On its website, http://www.essexwoodlands.com, Essex identifies itself as "one of the world's largest and most established healthcare venture capital firms."

## The Relationship Between Essex and Health Grades

11. Until approximately December 2005, Essex held approximately 9 million shares of HGRD, roughly 30% of the outstanding shares of HGRD, an investment it had made years before.

12. Because of the size of its HGRD position, Essex, through one of its "Venture Partners," Mark L. Pacala ("Pacala"), held a seat on Health Grades' board of directors at all times relevant to this Complaint. Pacala was an active member of Health Grades' board and Essex was hence privy to all material information concerning Health Grades and its operations at all times relevant to this Complaint.

### **Essex' Sale of Its HGRD Stock**.

13. Late in 2005, Essex engaged MDB to assist it in disposing of its 9 million shares of HGRD. From this point on, MDB knew or should have known all information concerning Health Grades that Essex possessed by virtue of the relationship between MDB and Essex.

14. Typically in such a situation, the venture capital firm, here Essex, would hire a reputable investment bank to put together a formal secondary stock offering, including a prospectus and/or private placement memorandum, and ask the management of the company at issue, here Health Grades, to undertake a "roadshow" to meet potential new investors. Essex, however, hired MDB with the stipulation that Essex would sell only if it could obtain a specific, minimum price per share and conducted a registered public offering.

15. Essex decided to sell its 9 million shares in two batches, or "tranches," the first to include approximately 5 million shares during late 2005, the second to consist of the remaining approximately 4 million shares at a later date.

16. Late in 2005, MDB approached Patrick Lin, portfolio manager of Partners, Offshore Partners, Focus and Primarius China, to determine whether those funds would be interested in purchasing HGRD from Essex. Soon thereafter, MDB arranged a meeting with Russell Anmuth ("Anmuth") of Gotham. Plaintiffs already held positions in HGRD at the time Essex decided to sell.

17. Anmuth met with Kerry Hicks, Heath Grades' CEO, Allen Dodge, Health Grades' CFO and Peter Conley of MDB at Gotham's offices at 520 Madison Avenue in New York on the afternoon of December 6, 2005.

18. Lin met with Messrs. Hicks and Dodge and Sarah Loughran, a Health Grades vice president, at the Primarius funds' offices at 101 California Street in San Francisco on the morning of December 9, 2005. Also present at this meeting was Steve Cosby, of Proximity Capital, another potential buyer of Essex' HGRD.

19. At each meeting, Health Grades management explained its growth strategies for the future and described a major contract Health Grades had entered into with Hewitt Associates ("Hewitt") on or about July 7, 2005 (the "Hewitt Contract").

20. Hewitt is headquartered in Lincolnshire, Illinois and describes itself on its website, http://www.hewitt.com, as "the world's largest provider of multi-service [human resources] business processing outsourcing (BPO), and the only firm fully integrating [human resources] outsourcing and consulting."

21. At the December 2005 meetings, Health Grades' management made a presentation to Plaintiffs which, Plaintiffs are informed and believe, and on that

basis allege, had been prepared by Essex and MDB and endorsed by Health Grades' board of directors. The presentation represented that the Hewitt Contract would give Hewitt unrestricted access to Health Grades' data bases and would result in a large increase in Health Grades' per annum revenue, beginning in early 2006. The Hewitt Contract was then in an evaluation phase, during which phase Health Grades and Hewitt were to evaluate each other's capacities to perform under the Hewitt Contract when fully implemented. It was represented to Plaintiffs at the December 2005 meetings that the evaluation phase was a mere formality and that full implementation of the Hewitt Contract was assured. At the December 2005 meetings, Mr. Conley of MDB said nothing to contradict any of the representations made concerning the Hewitt Contract.

22. Also in connection with Essex' first tranche, Essex and MDB prepared and distributed to Plaintiffs and others a Power Point presentation that stated, *inter alia*, that Health Grades' "employer partnership with Hewitt [was] scheduled for deployment to all [Hewitt] clients beginning in January 2006" and that "[a]nticipated annual revenues from [the] Hewitt relationship [would be] expanded [to] more than 10X current revenue to over $6 million by 2007."

23. Plaintiffs are informed and believe, and on that basis allege that the representations made at the December 2005 meetings that the full implementation of the Hewitt Contract was essentially certain as well as the representations made in the MDB/Essex Power Point presentation were false when made and that all Defendants knew or should have known that, in fact, the evaluation phase of the

Hewitt Contract was not a mere technicality, that, in fact, Health Grades and Hewitt had encountered serious difficulties and that the rosy predictions made in the MDB/Essex Power Point presentation with respect to anticipated increases in revenue were unlikely to come true. Plaintiffs are further informed and believe, and on that basis allege, that all the misrepresentations and omissions concerning the first tranche were made with scienter, *i.e.,* with the intent to deceive Plaintiffs and induce them to rely upon the misrepresentations and omissions and purchase shares of Health Grades stock from Essex.

24.   At or around the time of the first tranche, neither Essex nor MDB gave Plaintiffs any indication that the Hewitt Contract was in danger or that this danger even constituted a risk factor in connection with the investment, despite many contacts between MDB, on the one hand, and Gotham and the Primarius funds, on the other hand.

25.   In reliance on the misrepresentations and omissions made at the December 2005 meeting in New York and in the Essex/MDB documentation prepared in connection with the first tranche, including those concerning the Hewitt Contract, and on MDB's and Essex' omissions to communicate any contrary information, Gotham purchased approximately 150,000 shares of HGRD from Essex on or about December 19, 2005.  These misrepresentations and omissions were material to Gotham's decision to participate in Essex' offering of HGRD.  Gotham would not have purchased any HGRD shares had it been told the truth.

26. In reliance on the misrepresentations and omissions made at the December 2005 meeting in San Francisco and in the Essex/MDB documentation prepared in connection with the first tranche, including those concerning the Hewitt Contract, and on MDB's and Essex' omissions to communicate any contrary information, Partners purchased approximately 113,000 shares of HGRD from Essex on or about December 22, 2005. These misrepresentations and omissions were material to Partners' decision to participate in Essex' offering of HGRD. Partners would not have purchased any HGRD shares had it been told the truth.

27. In reliance on the misrepresentations and omissions made at the December 2005 meeting in San Francisco and in the Essex/MDB documentation prepared in connection with the first tranche, including those concerning the Hewitt Contract, and on MDB's and Essex' omissions to communicate any contrary information, Offshore Partners purchased approximately 70,000 shares of HGRD from Essex on or about December 22, 2005. These misrepresentations and omissions were material to Offshore Partners' decision to participate in Essex' offering of HGRD. Offshore Partners would not have purchased any HGRD shares had it been told the truth.

28. In reliance on the misrepresentations and omissions made at the December 2005 meeting in San Francisco and in the Essex/MDB documentation prepared in connection with the first tranche, including those concerning the Hewitt Contract, and on MDB's and Essex' omissions to communicate any

contrary information, Focus purchased approximately 320,000 shares of HGRD from Essex on or about December 22, 2005.  These misrepresentations and omissions were material to Focus' decision to participate in Essex' offering of HGRD.  Focus would not have purchased any HGRD shares had it been told the truth.

29.    On January 18, 2006, Health Grades filed a Form 8-K with the SEC attaching a press release concerning the status of the Hewitt Contract.  This press release stated that Hewitt had asked for a one-year extension of the evaluation phase, but had expressed to Health Grades its confidence that Health Grades would ultimately provide the services called for by the Hewitt Contract.  This misleading press release further stated that the parties were discussing how best to proceed.  There was no indication that the entire deal was in any way threatened; the worst case scenario was depicted as a possible delay in its full implementation. Indeed, the press release minimized the import of the news regarding the Hewitt Contract, stating that Health Grades' 2006 forecast still called for at least 40% revenue growth and a 25% operating margin. In Health Grades fourth quarter earnings conference call, Kerry Hicks, Health Grades' CEO, similarly stated, "Looking ahead, I would like to reiterate our 2006 revenue and operating margin forecasts. We are currently targeting at least 40% revenue growth over 2005, an operating margin of approximately 25% in 2006."

30.    In mid-February 2006, MDB conducted a "roadshow" to place Essex' remaining 4 million shares of HGRD.  In connection with the roadshow, Mr.

Conley of MDB prepared more upbeat documentation concerning Health Grades' condition and prospects. Plaintiffs are informed and believe, and on that basis allege, that this documentation had been reviewed and endorsed by Essex and by Health Grades' board of directors, including Pacala.

31.     MDB's documentation concerning Essex' second tranche of HGRD gave no indication whatsoever that there were problems with the Hewitt Contract, and that the Hewitt Contract might not be executed was not even noted as a potential risk factor in connection with the offering.

32.     At or around the time of the second tranche, neither Essex nor MDB nor Health Grades, despite Plaintiffs being Health Grades shareholders, gave Plaintiffs any indication that the Hewitt Contract was in danger or that this danger even constituted a risk factor in connection with the investment. MDB said nothing in this regard, despite ongoing contacts between MDB and Plaintiffs.

33.     Plaintiffs are informed and believe, and on that basis allege, that, at the time of the second tranche, Health Grades' and Hewitt's substantial difficulties in the Hewitt Contract's evaluation phase had continued, that no resolution was in sight and that all Defendants knew the Hewitt Contract was in serious danger of termination. Plaintiffs are further informed and believe, and on that basis allege, that all the misrepresentations and omissions concerning the second tranche were made with scienter, *i.e.,* with the intent to deceive Plaintiffs and induce them to

rely upon the misrepresentations and omissions and purchase shares of Health Grades stock from Essex.

34.     In continued reliance on Defendants' misrepresentations and omissions made in connection with the first tranche, and also in reliance on Defendants' misrepresentations and omissions made in the Essex/MDB documentation concerning the first and second tranches, including those concerning the Hewitt Contract, Gotham purchased approximately 150,000 shares of HGRD from Essex on or about February 27, 2006. In addition to its purchases of HGRD of December 19. 2005 and February 27, 2006, Gotham also purchased approximately 300,000 shares of HGRD in other transactions between December 19, 2005 and May 26, 2006. These misrepresentations and omissions were material to Gotham's decision to participate in Essex' second offering of HGRD and in its other purchases of HGRD between December 19, 2005 and May 36, 2006. Gotham would not have purchased these HGRD shares had it been told the truth.

35.     In continued reliance on Defendants' misrepresentations and omissions made in connection with the first tranche, and also in reliance on Defendants' misrepresentations and omissions made in the Essex/MDB documentation concerning the first and second tranches, including those concerning the Hewitt Contract, Partners purchased approximately 110,000 shares of HGRD from Essex for approximately on or about February 27, 2006. These misrepresentations and omissions were material to Partners' decision to participate

in Essex' second offering of HGRD. Partners would not have purchased any HGRD shares in this second offering had it been told the truth.

36. In continued reliance on Defendants' misrepresentations and omissions made in connection with the first tranche, and also in reliance on Defendants' misrepresentations and omissions in the Essex/MDB documentation concerning the first and second tranches, including those concerning the Hewitt Contract, Offshore Partners purchased approximately 70,000 shares of HGRD from Essex on or about February 27, 2006. These misrepresentations and omissions were material to Offshore Partners' decision to participate in Essex' second offering of HGRD. Offshore Partners would not have purchased any HGRD shares in this second offering had it been told the truth.

37. In continued reliance on Defendants' misrepresentations and omissions made in connection with the first tranche, and also in reliance on Defendants' misrepresentations and omissions in the Essex/MDB documentation concerning the first and second tranches, including those concerning the Hewitt Contract, Focus purchased approximately 270,000 shares of HGRD from Essex on or about February 27, 2006. These misrepresentations and omissions were material to Focus' decision to participate in Essex' second offering of HGRD. Focus would not have purchased any HGRD shares in this second offering had it been told the truth.

38. In reliance on Defendants' misrepresentations and omissions made in connection with the first tranche, and also in reliance on Defendants'

misrepresentations and omissions in the Essex/MDB documentation concerning the first and second tranches, including those concerning the Hewitt Contract, Primarius China purchased approximately 250,000 shares of HGRD from Essex on or about February 27, 2006. These misrepresentations and omissions were material to Primarius China's decision to participate in Essex' second offering of HGRD. Primarius China would not have purchased any HGRD shares in this second offering had it been told the truth.

39. Plaintiffs are informed and believe, and on that basis allege that during the roadshow, MDB, a market-maker with respect to HGRD, itself or through certain of its clients, was involved in front-running and short-sold HGRD in advance of Essex' huge block trade and also manipulated the market in HGRD so as to generate intra-day spikes in HGRD's price up to the minimum at which Essex was willing to sell.

40. Immediately after Essex' block trade of its remaining 4 million shares of HGRD, HGRD's price fell by approximately 10%.

41. Between February 27, 2006 and March 23, 3006, HGRD lost almost 50% of its market value, its price falling from $5.95 to $3.30.

42. Within 45 days of Essex' block trade of its remaining 4 million shares of HGRD, Pacala resigned from Health Grades' board of directors.

43. On or about March 31, 2006, Health Grades filed its Form 10-K with the SEC. Health Grades' 10-K, for the first time, revealed that negotiations for the

Hewitt Contract had been terminated without a deal, and that Health Grades had commenced litigation against Hewitt.

44. In a press release of November 1, 2006, Health Grades' management formally reduced its 2006 projections, citing failure of the deal with Hewitt as a major reason. The press release stated, *inter alia*, "we have been challenged throughout the year to overcome what we had anticipated to be an incremental $3.5 million in revenue from an expanded relationship with Hewitt," adding that "[o]ur expenses for the quarter have increased more than anticipated as a result of ongoing arbitration legal fees," among other things.

45. As a direct and proximate result of Defendants' fraud and other misconduct, Gotham has suffered a loss of approximately $1.1 million.

46. As a direct and proximate result of Defendants' fraud and other misconduct, Partners, Offshore Partners, Focus and Primarius China have collectively suffered a loss of approximately $2.7 million.

## COUNT I

### Section 10(b) of the Exchange Act and Rule 10b-5

(Against All Defendants)

47. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 46 above, as if fully set forth herein.

48. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security,

and by use of a means or instrumentality of interstate commerce, the mails or a facility of a national securities exchange, have:

    (a)    employed a device, scheme or artifice to defraud;

    (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in acts, practices and/or courses of business which operated or would operate as a fraud or deceit upon any person.

49.    As a direct and proximate result, Plaintiffs, and each of them, have suffered damages in an amount to be determined at trial.

## COUNT II

## Section 12 of the Securities Act

(Against All Defendants)

50.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 49 above, as if fully set forth herein.

51.    Defendants, and each of them, by engaging in the conduct described above, directly and indirectly, by the use of means and/or instruments of transportation and/or communication in interstate commerce and/or of the mails, have:

    (a)  offered and or sold a security;

    (b)  by means of a prospectus and/or oral communication;

    (c)  which included untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, and with respect to which Plaintiffs did not know of such untruth or omission.

52. As a direct and proximate result, Plaintiffs, and each of them, have suffered damages in an amount to be determined at trial.

## COUNT III

### Fraud

(Against All Defendants)

53. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 52 above, as if fully set forth herein.

54. As described herein, Defendants and each of them made numerous material misrepresentations with knowledge of their falsity, and/or numerous knowing, intentional omissions of material fact to Plaintiffs with the intention of inducing Plaintiffs to rely upon such misrepresentations and/or omissions, Plaintiffs reasonably relied upon these misrepresentations and, as a direct and proximate result, suffered great damage.

## COUNT IV

### Negligent Misrepresentation

(Against All Defendants)

55. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 54 above, as if fully set forth herein.

56. As described herein, in breach of the duty of care they owed Plaintiffs, Defendants and each of them made numerous careless and negligent misrepresentations and/or omissions directly to Plaintiffs with knowledge or notice that these misrepresentations and/or omissions would be acted upon and with intent that Plaintiffs would so rely. Plaintiffs reasonably relied upon these misrepresentations and omissions and, as a direct and proximate result, suffered great damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Awarding Plaintiffs compensatory damages, together with appropriate pre-judgment interest at the maximum rate allowable by law;

B. Awarding Plaintiffs punitive damages with respect to Count III;

C. Awarding Plaintiffs their costs and expenses for this litigation, including reasonable attorney's fees, expert fees and other disbursements; and

D. Awarding Plaintiffs such other relief as might be deemed just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:   New York, New York
            March 28, 2007

                        FAGELBAUM & HELLER LLP

                        /s/
By:   _____
                        Philip Heller (PH-7792)
                        2049 Century Park East, Suite 4250
                        Los Angeles, California 90067
                        (310) 286-7666

                        - and -

                        AKERMAN SENTERFITT LLP

                        /s/
By:   _____
                        Martin Domb (MD-4109)
                        335 Madison Avenue, 26th Floor
                        New York, New York 10017
                        (212) 880-3800

                        Attorneys for Plaintiffs