UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
GOTHAM HOLDINGS, LP,
PRIMARIUS PARTNERS LP,
PRIMARIUS OFFSHORE PARTNERS LTD.,                    Case No.: 07 CV 2563
PRIMARIUS FOCUS LP,
PRIMARIUS CHINA FUND LP,
WILLOW CREEK CAPITAL PARTNERS, LP,
WILLOW CREEK CAPITAL PARTNERS II, LP, and
WILLOW CREEK OFFSHORE, LTD.

              Plaintiffs,

vs.                                                 **FIRST AMENDED COMPLAINT**

HEALTH GRADES, INC.,                                **DEMAND FOR JURY TRIAL**
MDB CAPITAL GROUP LLC, and
ESSEX WOODLANDS HEALTH VENTURES,

              Defendants.
----------------------------------------------------------x

      Plaintiffs Gotham Holdings, LP, Primarius Partners LP, Primarius Offshore Partners LP,

Primarius Focus LP, Primarius China Fund LP, Willow Creek Capital Partners, LP, Willow

Creek Capital Partners II, LP, and Willow Creek Offshore, Ltd. allege:

<u>**Jurisdiction and Venue**</u>

     1.     This action arises under§ 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and

Rule 10b-5 promulgated thereunder, and under § 12(a) of the Securities Act, 15 U.S.C. § 77l(a),

as hereinafter more fully appears.  This Court therefore has subject matter jurisdiction under 28

U.S.C. § 1331. The Court should assume supplemental subject matter jurisdiction of Plaintiffs'

state law claims under 28 U.S.C. § 1367 because those claims and Plaintiffs' federal claims arise

out of a common nucleus of operative fact.

     2.     Defendants each transact business and/or are found within this District.

Accordingly, this Court has personal jurisdiction over each Defendant, and venue is proper under

28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to the claims herein transpired in this District.

**The Parties**

3.      Plaintiff Gotham Holdings, LP ("Gotham") is a limited partnership organized under the laws of Delaware with its principal place of business in New York, New York. Gotham is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

4.      Plaintiff Primarius Partners LP ("Partners") is a Delaware limited partnership with its principal place of business at One Montgomery Street, San Francisco, California.  Partners is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

5.      Plaintiff Primarius Offshore Partners Ltd. ("Offshore Partners") is a British Virgin Islands corporation with its principal place of business at One Montgomery Street, San Francisco, California. Offshore Partners is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

6.      Plaintiff Primarius Focus LP ("Focus") is a Delaware limited partnership with its principal place of business at One Montgomery Street, San Francisco, California.   Focus is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of

securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

7.      Plaintiff Primarius China Fund LP ("Primarius China") is a Delaware limited partnership with its principal place of business at One Montgomery Street, San Francisco, California.  Primarius China is a "hedge fund" until recently in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.  Primarius China is currently in the process of winding up its affairs.

8.      Plaintiff Willow Creek Capital Partners, LP is a limited partnership organized under the laws of Delaware with its principal place of business in Greenbrae, California. Willow Creek Capital Partners, LP is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

9.      Plaintiff Willow Creek Capital Partners II, LP is a limited partnership organized under the laws of Delaware with its principal place of business in Greenbrae, California. Willow Creek Capital Partners II, LP is a "hedge fund" in the business of investing on behalf of its limited partners in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies.

10.     Plaintiff Willow Creek Offshore, Ltd. is a corporation organized under the laws of the Cayman Islands with its principal place of business in Greenbrae, California. Willow Creek

3

Offshore, Ltd. is a "hedge fund" in the business of investing on behalf of its shareholders in a broad range of securities and other instruments including without limitation options, preferred stock, debt instruments, cash equivalents and privately-placed securities of public and private companies. Willow Creek Capital Partners, LP, Willow Creek Capital Partners II, LP, and Willow Creek Offshore, Ltd. are referred to collectively herein as "Willow Creek."

11.     Defendant Health Grades, Inc. ("Health Grades") is a corporation organized under the laws of Delaware with its principal place of business in Golden, Colorado.   Health Grades is, and at all relevant times has been, in the business of "grading" and providing reports concerning the quality of  hospitals, physicians, nursing homes, home health agencies, hospice programs and other health care providers.  Its customers include consumers, health plans, employers, doctors and liability insurance companies.  Health Grades has at all relevant times traded as HGRD on NASDAQ.

12.     Defendant MDB Capital Group LLC ("MDB") is a limited liability company organized under the laws of California with its principal place of business in Santa Monica, California.  MDB is in the business of providing merchant and investment banking, market research, "roadshow" and market making services.

13.     Defendant Essex Woodlands Health Ventures, LLC ("Essex") is a limited liability company organized under the laws of Delaware with principal places of business in Palo Alto, California,  The Woodlands, Texas, New York City and London.  On its website, http://www.essexwoodlands.com, Essex identifies itself as "one of the world's largest and most established healthcare venture capital firms."

## The Relationship Between Essex and Health Grades

14.      At all relevant times prior to December 19,  2005, Essex held approximately 9 million shares of HGRD, roughly 30% of all outstanding shares, an investment it had made years before. Thereafter, until February 27, 2006, Essex held approximately 4 million shares of HGRD, approximately 15% of outstanding shares.

15.      Because of the size of its HGRD position, Essex, through one of its Managing Directors, Mark L. Pacala ("Pacala"), held a seat on Health Grades' board of directors at all times relevant to this First Amended Complaint (the "FAC").  Pacala was an active member of Health Grades' board and, as such, both he and Essex were privy to all material information concerning Health Grades and its operations at all times relevant to this FAC.

## Health Grades Discloses the Hewitt Contract

16.      Health Grades' Form 8-K filed with the SEC on July 7, 2005 (the "July 7, 2005 8-K") disclosed that, on July 1, 2005, Health Grades and Hewitt Associates, LLC ("Hewitt") had entered into a "Development and Services Agreement" (the "Hewitt Contract") with an effective date of June 30, 2005. A true and correct copy of the July 7, 2005 8-K is appended to this FAC as Exhibit A.

17.      Hewitt is headquartered in Lincolnshire, Illinois and describes itself on its website, http://www.hewitt.com, as "the world's largest provider of multi-service [human resources] business processing outsourcing (BPO), and the only firm fully integrating [human resources] outsourcing and consulting." Hewitt's website also states that the company has 2,500 clients, and offices in 35 countries. According to a November 5, 2005 Business Wire report, Hewitt reported net revenues of $711.9 million for the quarter ending June 30, 2005 which, if annualized, would equate to yearly net revenues exceeding $2.8 billion. By contrast, Health

Grades reported revenues of approximately $ 4.9 million to the SEC for the same quarter, or, if annualized, $19.6 million.

18.    Health Grades' July 7, 2005 8-K described the Hewitt Contract in pertinent part as follows:

> Under the Agreement, Health Grades will develop and host applications that will enable Hewitt's clients to make available to their employees and other participants enhanced Health Grades healthcare quality information as well as other information regarding providers in a particular health plan's network. . . . Additionally, Hewitt's clients will have access to Health Grades quality ratings on more than 5,000 hospitals nationwide with respect to more than 100 procedures and diagnoses. Health Grades will earn $400,000 for an initial pilot of these services, described below, if successful. In addition, based on Health Grades' current expectations regarding Hewitt client participants that will utilize its applications, Health Grades' expanded relationship with Hewitt is expected to generate revenue of over $4 million in 2006 (including over $3.5 million pursuant to the Agreement). For 2007 and subsequent years covered by the Agreement, total revenue related to the Agreement is anticipated to be in excess of $6 million annually.

> The Agreement provides that, during an initial evaluation period that ends on December 31, 2005, Health Grades will provide pilot services to one Hewitt client. At the end of the evaluation period, Hewitt will determine whether Health Grades was successful in providing the pilot services. In addition, during the evaluation period, Hewitt will evaluate Health Grades' capacity to collect, process, integrate, deploy, maintain and update provider-specific data received from health plans that will enable a Hewitt client participant to determine the identity of providers in a health plan's network. If Hewitt determines that the pilot services were not successful or otherwise do not warrant continuation of the Agreement, or if Hewitt determines that Health Grades is not capable of providing the services relating to provider-specific data on an ongoing basis, Hewitt may terminate the Agreement, or, in connection with the services relating to provider-specific data, continue the Agreement subject to fee reductions.

> If Hewitt's evaluations are favorable, Hewitt will pay to Health Grades, beginning in February 2006, a fee based on the total number of Hewitt clients' participants with access to the Health Grades web sites, and the type of services to which the participants have access, in accordance with a fee schedule attached to the Agreement, subject to minimum payments of $3,000,000 per annum in 2007, 2008 and 2009.

* * *

The Agreement will continue until December 31, 2009, subject to automatic renewal for up to two consecutive one-year terms, unless either party provides 90 days' notice of an intent not to renew.

19.     The execution of the Hewitt Contract was an extremely significant development for Health Grades. Pursuant to that agreement, Health Grades would now be selling its products and services to Hewitt, a high profile, multi-billion dollar, global leader in the human resources industry, and to Hewitt's 2,500 clients located all over the world. Health Grades projected that the Hewitt Contract would generate approximately $4 million in new revenues annually beginning in 2006, roughly a 20% increase over the (annualized) revenues it had just reported for the quarter ending June 30, 2005, and more than $6 million in new annual revenues beginning in 2007.

## Relevant Terms of the Hewitt Contract

20.     On November 14, 2005, Health Grades filed a redacted copy of the Hewitt Contract with the SEC as an exhibit to its Form 10-Q for the quarter ending September 30, 2005. A true and correct copy of the filed version of the Hewitt Contract is appended to this FAC as Exhibit B. This version omits certain schedules and other parts of the agreement and replaces them with a statement that the omitted material was "filed separately with the Securities and Exchange Commission pursuant to a confidential treatment request." *See, e.g.,* Schedules A-C. Redacted parts of the Hewitt Contract are referred to as "omitted" when referenced herein.

21.     The Hewitt Contract required Health Grades to perform a host of services during the evaluation phase for an unidentified Hewitt "Pilot Client:"

> "Development of Search Tools and Sites. Health Grades shall develop, in accordance with Hewitt's requirements as set forth in [omitted] Schedule B, the Tool[1] and the Sites,[2] as described in [omitted] Schedule A. As set forth in more

---

[1] The agreement defines "Tool" as "[t]he web-based health care provider search tool to be developed and implemented by Health Grades and to be integrated into the Sites in accordance with Hewitt's requirements as set forth in the [omitted] Specification." Hewitt Contract § 1.

detail in the [omitted] Specification, the Sites shall be configured to allow each Hewitt Client to select whether its participants will have access to [certain types of searches]." Hewitt Contract § 3a.

"Site Hosting. Health Grades will host the Sites and provide access to the Sites for Hewitt Clients and their participants. The Sites will initially be made available to the Pilot Client, and upon Hewitt's written determination that the Pilot Services[3] have been successful, the Sites will be made available to other Hewitt Clients on a schedule to be determined jointly by Hewitt and Health Grades. With respect to each Hewitt Client, Hewitt shall instruct Health Grades as to which Search Level and application type . . . such Hewitt Client requires, and Health Grades shall configure the Sites so that Hewitt Clients have access to the appropriate Sites to accommodate such Search Level and application type." Hewitt Contract § 3b.

"Network Tag Services. As set forth in the [omitted] Specification, the Tool shall display, to each Hewitt Client's participants, information regarding whether or not the providers retrieved by a search participate in the health plans that are applicable to such Hewitt Client. Hewitt and Health Grades shall work together during the Evaluation Period to collect Network Tags[4] from health plans selected by Hewitt. While performing the Pilot Services, Health Grades will be responsible for integrating the Network Tags received from Hewitt's current provider into the Tool and the Sites as appropriate. . . .." Hewitt Contract § 3c.

22.    The Hewitt Contract provided that Hewitt would "review Health Grades' performance of Pilot Services" and "evaluate the capacity of Health Grades to perform all Network Tag Services on an ongoing basis." Hewitt Contract §§ 4 and 5. "[N]o later than December 31, 2005," Hewitt was to "make a determination in writing as to whether or not Health Grades was successful in providing Pilot Services," and had the right to terminate the agreement if that determination were negative. *Id.* § 4. Similarly, Hewitt could terminate the agreement

---

[2] The agreement defines "Sites" as "[t]he web sites (as identified in [omitted] Schedule A) to be developed and implemented by Health Grades for [certain applications] as applicable, in accordance with Hewitt's requirements as set forth in the [omitted] Specification and to be hosted by Health Grades as a subcontractor to Hewitt." § 1.

[3] The agreement defines "Pilot Services" as "[t]he Services to be performed by Health Grades on behalf of the Pilot Client." Hewitt Contract § 1.

[4] The agreement defines "Network Tags" as "[p]rovider-specific data received from health plans (including [material omitted])." Hewitt Contract § 1.

were it to determine that Health Grades was "not suitable to provide Network Tag Services on an ongoing basis." *Id.* § 5.

23.     The Hewitt Contract also designated certain individuals as "Authorized Representatives" of each party to be responsible for the performance of the agreement. *Id.* § 9a. Health Grades' "Authorized Representatives" were Kerry Hicks ("Hicks"), Health Grades' CEO and a member of Health Grades' board, Allen Dodge, Health Grades' CFO, and David Hicks, Health Grades' Executive Vice President for Information Technology and Hicks' brother. *Id.* The parties' Authorized Representatives were required to meet at least quarterly "to assess the Parties' performance" under the agreement, but such meetings could be scheduled more frequently at Hewitt's request. *Id*. § 9b.

24.      Finally, § 21 of the Hewitt Contract, titled "Dispute Resolution," set out a mandatory, 90-day dispute resolution process, called "Internal Escalation," that the parties were required to follow as a prerequisite to seeking final relief through arbitration. The process began when either party gave the other "written notice of any dispute not resolved in the ordinary course of business." *Id.* § 21b.

25.     The party receiving the notice then had 15 days to submit a written response. *Id.* Both the notice and the response were required to designate "the executive who [would] represent that Party and any other person who [would] accompany that executive." *Id.*

26.     Within 30 days of the delivery of the notice, "the designated executives [were required] to meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem[ed] necessary, to attempt to resolve the dispute." *Id.*

27.     If the parties failed to resolve their dispute within 60 days of the delivery of the notice (or if they failed to meet within 30 days), "the dispute [was to be] referred to more senior

executives who [had] authority to settle the dispute and who [were] likewise [required to] meet in an attempt to resolve the matter in dispute." *Id.* Only if the dispute were not resolved within 30 days after its referral to the senior executives (or if the senior executives failed to meet within 15 days) was a party permitted to seek arbitration. *Id.*

### Essex Retains MDB as Its Agent for the Liquidation of Its HGRD Position

28.     On December 19, 2005, Health Grades filed with the Securities and Exchange Commission ("SEC") a "Supplement, Dated December 19, 2005, to Prospectus Dated May 12, 2005," a true and correct copy of which is appended to this FAC as Exhibit C, which stated in pertinent part:

> Essex Woodlands Health Ventures IV, L.P. ("Essex Woodlands") has advised us that it has retained MDB Capital Group LLC ("MDB Capital"), a registered broker-dealer, as agent in connection with the offer to institutional investors of 9,136,802 shares of our common stock that Essex Woodlands owns. Essex Woodlands is offering 5,000,000 of its shares at a price of $5.50 per share, or an aggregate of $27,750,000. The remaining 4,136,802 shares will be offered at a price or prices to be negotiated. MDB Capital will be acting in a dual agency capacity receiving a commission of $0.05 per share from Essex Woodlands, or $465,840 if all 9,136,802 shares offered by Essex Woodlands are sold, and $0.05 per share from the institutional purchasers. As a result, total commissions payable to MDB Capital will be $.10 per share, or $913,680 if all 9,136,802 shares are sold. Net proceeds to Essex Woodlands if the 5,000,000 shares offered at $5.55 per share are sold will be $27,500,000. Net proceeds to Essex Woodlands with respect to the remaining 4,136,802 shares will be dependent on the actual price or prices that are negotiated.

29.     Essex decided to conduct a registered public offering of its HGRD pursuant to Health Grades' May 12, 2005 prospectus, and hired MDB with the stipulation that Essex would sell only if it could obtain a specific, minimum price per share.

30.     Essex decided to sell its 9 million shares in two batches, or "tranches," the first to include approximately 5 million shares, which were ultimately sold on December 19, 2005, the

second to consist of the remaining approximately 4 million shares, which were sold on February 27, 2006.

## MDB Approaches Plaintiffs

31.     During the second half of November 2005, Peter Conley ("Conley"), at all relevant times a Managing Director of MDB, called Lin of the Primarius funds. Conley was a personal friend of Lin's and they had worked together as Managing Directors in capital markets at E*Offering in San Francisco from 1999-2000. Conley explained that MDB was representing Essex, which wished to sell its entire 9 million-share position in HGRD over the next several months because Essex wished to launch a new fund and needed to obtain a minimum price in order to maximize its internal rate of return. Conley spoke in glowing terms about HGRD as a good investment, and as Health Grades itself as a sound company with a bright future in terms of its growth and revenue potential, operating in the burgeoning health care industry. In particular, Conley described the Hewitt Contract as a source of highly significant new revenue for Health Grades.

32.     On November 28, 2005, Conley followed up this phone conversation with an email message to Lin titled "ROADSHOW: Health Grades (HGRD)" which touted Health Grades' virtues in greater detail. With respect to the Hewitt Contract, this email message stated:

> HGRD's employer partnership with Hewitt (HEW) established in 2005 is focused on the Fortune 1000 employer market and is scheduled for deployment to all HEW clients beginning in January 2006.

33.      At Conley's request to be introduced to additional potential investors, Lin contacted Anmuth and told him about what appeared to be a good investment opportunity. During the last week of November or the first week of December 2005, Conley called Anmuth

and made the same representations to Anmuth with respect to Health Grades and the Hewitt
Contract he had made to Lin.

### Misrepresentations and Omissions in Connection with the First Tranche

### 1.   The December 2005 Meetings

34.    On the afternoon of December 6, 2005, Anmuth met with Hicks and Dodge at
Gotham's office at 520 Madison Avenue in New York. Hicks and Dodge provided a general
description of Health Grades and its growth and business strategies. Hicks also described the
Hewitt Contract, explaining that it would greatly increase Health Grades' revenue beginning in
2006. Hicks stated that the Hewitt Contract was in an evaluation phase, but that this phase was
complete and was a mere technicality or formality anyway, and that full implementation of the
agreement at the beginning of 2006 was assured. Dodge indicated agreement with everything
Hicks said.

35.    On the morning of December 9, 2005, Lin met with Hicks, Dodge, Conley, and
Sarah Loughran, Health Grades' Executive Vice President for Provider Services, at the Primarius
funds' office at 101 California Street in San Francisco. During this meeting, Hicks and Dodge
again provided general information about Health Grades and explained its growth strategies and
projections. Hicks also described what he termed a "big" contract with Hewitt. Hicks explained
that, to date, Health Grades' business had come mostly from "providers," *i.e.*, from physicians,
hospitals, nursing homes, and other providers of health care services. The Hewitt Contract, he
said, would be Health Grades' entree into the far more lucrative business available from payors
and employers, *i.e.*, the parties who foot the bill for health care services. Under the Hewitt
Contract, Health Grades would be providing services to Hewitt, the worlds largest human
resources consulting firm, and its 2,500 payor and employer clients. But, beyond that, servicing

Hewitt and its prominent, Fortune 1000 clients would give Health Grades credibility and name recognition with other payors and employers, and thus constituted an enormous opportunity for Health Grades to expand its business.

36.     As he had at the meeting with Anmuth, Hicks explained that the Hewitt Contract was in an evaluation phase, but again stated that this was merely a formality and was complete in any event. In fact, Hicks said that full implementation of the Hewitt Contract was only "awaiting signatures," and that as soon as the relevant persons returned from out of town, those signatures would be obtained. Lin asked about the potential downside were the Hewitt Contract not to go forward, what the risk was that that might happen, and whether the parties had encountered any problems during the evaluation phase. Hicks responded that Health Grades had been "working with Hewitt for six months," and that there had been "no problems at all," and that there was consequently no risk.

37.     At the December 6 and 9, 2005 meetings, Hicks also walked Anmuth and Lin through a Power Point presentation that had been prepared by Essex and MDB. The presentation was obviously endorsed by Health Grades, given that Hicks used it in making his pitch to Anmuth and Lin. The presentation stated, *inter alia*, that Health Grades' "employer partnership with Hewitt [was] scheduled for deployment to all [Hewitt] clients beginning in January 2006" and that "[a]nticipated annual revenues from [the already existing] Hewitt relationship [would be] expanded [to] more than 10X current revenue to over $6 million by 2007."  Neither the presentation nor Hicks in his explanation of it said anything about any risks of any sort associated with the Hewitt Contract.

38.     On December 9, 2005, Randall Huyser ("Huyser"), and independent financial consultant, acting on behalf of Willow Creek and others, Mike Cheng of the Primarius funds, and

several others attended a lunchtime meeting in San Francisco conducted by Health Grades for

potential investors in Essex' offering. Hicks and Dodge represented Health Grades at the

meeting. They provided a general overview of Health Grades and its business, strategies and

projections, and also discussed the Hewitt Contract. As at the meetings with Lin and Anmuth,

Hicks described the Hewitt Contract not only as a highly significant deal for Health Grades in

terms of projected new revenues of 20% over current revenues, but also as a major opportunity

for Health Grades to expand its business into the lucrative payor and employer area. Hicks

walked the attendees through the same Power Point presentation made to Lin and Anmuth at

their December 2005 meetings. Hausman received a copy of this presentation at or around the

time of the meeting. Hicks said absolutely nothing at the meeting about any problems with

Health Grades' performance of the Hewitt Contract during the evaluation phase, or about any

dissatisfaction on the part of Hewitt with Health Grades' performance. Huyser reported the

representations made at this meeting to Hausman within days after the meeting.

39.     The oral representations made by Hicks and Dodge at the three December

meetings, and those contained in the Power Point presentation concerning the status of the

Hewitt Contract, were false when made, and each Defendant must have known this, *i.e.,* acted

with the requisite scienter. The pitch made at the December meetings also omitted much material

information. In its 2005 Form 10-K, filed with the SEC on March 31, 2006, Health Grades

disclosed that it had commenced arbitration against Hewitt three days earlier after a months-long

dispute the severity of which it had never before even hinted at. A true and correct copy of

Health Grades' 2005 Form 10-K (the "2005 10-K) is attached to this FAC as Exhibit D. In the

2005 10-K, Health Grades stated:

> In the demand for arbitration, we claim, among other things, that Hewitt has
> willfully repudiated and breached the terms of the Agreement by falsely

> contending that it had the right to terminate the agreement ***based on our performance of the pilot services and the Network Tag Services***; by refusing to continue to perform under the Hewitt Agreement; and by falsely contending that we had materially breached the Agreement ***when Hewitt had precluded us from providing services under the Agreement*** . . . .

2005 10-K at 21 (emphasis added).

40.     In Health Grades' view, therefore, Hewitt had obstructed Health Grades' performance under the Hewitt Contract during the evaluation period, *i.e.,* from June 30 through December 31, 2005. Hicks and Dodge, both by virtue of their positions at Health Grades and their status as Health Grades' "Authorized Representatives" under the Hewitt Contract, had personal knowledge of all aspects of the Hewitt Contract and its performance and could not conceivably have been unaware of this alleged obstruction at the time they made their representations at the December meetings, mere days before the end of the evaluation period on December 31, 2005. Moreover, the Hewitt Contract provided for Hewitt's ongoing assessment of Health Grades' performance and also required Hewitt and Health Grades, *i.e.,* Hicks and Dodge, to meet at least quarterly to assess the status of the agreement. Under these circumstances, both Hewitt's alleged obstruction and its issues with Health Grades' performance of both the Pilot Services and the Network Tags Services described in the 2005 10-K must certainly have been discussed at these ongoing meetings and as part of Hewitt's ongoing assessment of Health Grades' performance. Indeed, Hicks himself said that Health Grades had been "working with Hewitt for six months." If so, then Health Grades must have known that Hewitt was not happy with Health Grades' performance when he told Anmuth and Lin that there had been "no problems" and that full implementation of the Hewitt Contract was merely "awaiting signatures." There was no mention at any of the meetings of the fact that Hewitt was dissatisfied with essentially all of Health Grades' performance under the Hewitt Contract, *i.e.,* its performance of both the Pilot Services and the Network Tag Services.

41.    In preparing the Power Point presentation, MDB had a duty as an investment banker, as a registered broker-dealer, and as Essex' agent to perform sufficient due diligence to ascertain that the information it was disseminating to the investing public was accurate and not misleading. Essex, with a seat on Health Grades' board, is chargeable as a matter of law with knowledge concerning a matter as major as the Hewitt Contract, including knowledge that that agreement's evaluation phase had not gone well–that Hewitt, according to Health Grades, had allegedly obstructed Health Grades' performance and that Hewitt was dissatisfied with Health Grades' performance of both the Pilot Services and the Network Tag Services. Moreover, because of its status as a Health Grades insider, Essex had a duty not to mislead potential purchasers of its shares, either directly, or through its agent, MDB. All Defendants acted at the very least with recklessness in preparing and disseminating the false and misleading information in the presentation.

### 2.    The December 2005 Conversations with Conley

42.    After the meeting on December 9, 2005, Lin spoke with Conley on the phone. Lin again asked for assurance that there were no problems with the Hewitt Contract and that its full implementation was certain, as he had been told earlier at the meeting, and Conley reiterated what had been said at the meeting–that the Hewitt Contract's evaluation phase was over, that full implementation was assured, and that there was no risk. In fact, Lin spoke on the phone with Conley almost every business day between the December 9, 2005 meeting and the date of the sale of the first tranche of Essex' HGRD shares, December 19, 2005, and received the same assurances each time. During each call, Conley said that he was in constant communication with Hicks and Pacala and that his information had come from them. At no time during any of these conversations did Conley disclose Hewitt's dissatisfaction with Health Grades' performance

under the Hewitt Contract or Health Grades' position that Hewitt had obstructed that performance.

43.    For his part, Anmuth spoke with Conley on the phone again between the New York meeting and December 19, 2005, and was told again that the evaluation phase was a mere formality and that full implementation of the Hewitt Contract was assured.  Conley told Anmuth that his information had come from Hicks and Pacala. As in his conversations with Lin, Conley made no mention of Hewitt's dissatisfaction with Health Grades' performance under the Hewitt Contract or Health Grades' position that Hewitt had obstructed that performance.

44.    The representations and omissions in Conley's December 2005 phone conversations with Lin and Anmuth are attributable to MDB directly, to Essex as MDB's principal and because the false information had come from Pacala, and to Health Grades because the false information had come through Hicks. These representations were made with the requisite scienter and were knowingly, or at the very least recklessly, false as to all three Defendants for the same reasons as were those made at the December 2005 meetings and in the Power Point presentation made at those meetings.

### Motive and Opportunity with Respect to the
### First Tranche Misrepresentations and Omissions

45.    All three Defendants had powerful motives for concealing the true status of the Hewitt Contract. Health Grades by this point had been touting the Hewitt Contract for months as a primary revenue driver for the company for the foreseeable future and the doorway to lucrative payor and employer business. The company had projected that the Hewitt Contract would generate approximately $4 million in new revenue in 2006, a 20% increase over its annualized revenues reported for the quarter ending June 30, 2005, and $6 million annually beginning in 2007, and that that agreement's full implementation was a certainty. Hicks and Dodge had been

meeting with potential investors like Lin and Anmuth representing how "big" the Hewitt deal was going to be for the company. Health Grades undoubtedly knew that, were it to reveal that the Hewitt Contract was in danger mere days before Essex planned to dump its first, huge tranche of HGRD on the market, HGRD's price would likely go into free fall. Hicks, who according to Health Grades' 2005 Form 10-K/A (the "2005 10-K/A"), a true and correct copy of which is appended to this FAC as Exhibit E, himself owned more than 4 million shares of HGRD, or over 13% of shares outstanding, and Dodge, who owned 2.6%, personally had the same motivation to conceal the severity of Health Grades' dispute with Hewitt. 2005 10-K/A at 7. It was vital, therefore, for Health Grades, and Hicks and Dodge, to conceal the true nature of Health Grades' dispute with Hewitt at least until Essex had sold all its shares.

46.    Essex obviously had a strong interest in keeping HGRD's price as high as possible until after it had liquidated its position. Essex certainly knew that it would be unable to liquidate its first enormous tranche of HGRD at anything but a steep discount if the truth concerning the status of the Hewitt Contract were disclosed. MDB, as Essex' agent, had the same motivation. Moreover, as MDB told Lin, Essex was willing to sell only at a particular minimum price, and, if that price could not be achieved and Essex did not sell, MDB would receive no commission.

47.    All three Defendants also had the opportunity to commit fraud (and did) with respect to the first tranche. Health Grades, through Hicks and Dodge, communicated directly with Plaintiffs. MDB communicated directly with Plaintiffs through Conley. Essex communicated with Plaintiffs through its agent, MDB, and through Health Grades.

**Plaintiffs Purchase HGRD in Essex' First Tranche**

48.    On December 19, 2005, in reliance upon the misrepresentations and omissions described above, Gotham purchased approximately 150,000 shares of HGRD at $5.55 per share.

49.    On December 19, 2005, in reliance upon the misrepresentations and omissions described above, Partners purchased approximately 113,000 shares of HGRD at $5.55 per share.

50.    On December 19, 2005, in reliance upon the misrepresentations and omissions described above, Offshore Partners purchased approximately 70,000 shares of HGRD at $5.55 per share.

51.    On December 19, 2005, in reliance upon the misrepresentations and omissions described above, Focus purchased approximately 320,000 shares of HGRD at $5.55 per share.

52.    On December 19, 2005, in reliance upon the misrepresentations and omissions described above, Willow Creek purchased approximately 67,000 shares of HGRD at $5.55 per share.

53.    Plaintiffs' reliance on Defendants' misrepresentations and omissions was entirely reasonable. As detailed above, Health Grades' CEO and CFO, as well as MDB, through Conley, and Essex, through its agent, MDB, and also through Health Grades, had repeatedly assured Plaintiffs that the Hewitt Contract's full implementation was assured and that, because of that, the new revenue that agreement was projected to generate was likewise certain. Plaintiffs had no reason to doubt the truth of these misrepresentations. The six-month evaluation period was mere days from being over, and Defendants had told Plaintiffs that there had been "no problems" during that evaluation and, indeed, that full implementation was merely "awaiting signature." No Plaintiff would have purchased any shares of HGRD had they been told the truth about the Hewitt Contract.

54.     The misrepresentations and omissions  made in connection with the first tranche were certainly material when considered as part of the total mix of information available to Plaintiffs in making their decisions to purchase HGRD from Essex in the first tranche. Health Grades had stated, both publicly, in its July 7, 2005 8-K, and privately to Plaintiffs, that the Hewitt Contract, whose full implementation Defendants had represented was certain, would generate at least a 20% increase in Health Grades' revenue beginning in 2006. Defendants had all also, both publicly in Health Grades' July 7, 2005 8-K, and privately to Plaintiffs, characterized the Hewitt Contract as a highly significant and positive development for Health Grades. No Plaintiff would have purchased any shares of HGRD in Essex' first tranche had they been told the truth with respect to the status of the Hewitt Contract prior to making those purchases.

## Health Grades Discloses Essex' First Tranche Sales

55.     On December 23, 2005, Health Grades filed with the SEC a "Supplement, Dated December 23, 2005, to Prospectus, Dated May 12, 2005," which stated:

> Essex Woodlands Health Ventures IV, L.P. ("Essex Woodlands") has advised us that it has sold 5,000,000 shares of our common stock at a price of $5.55 per share, or an aggregate of $27,750,000. MDB Capital Group LLC, a registered broker-dealer, acted in a dual agency capacity in connection with the sale, receiving a commission of $0.05 per share from Essex Woodlands, or $250,000, and $0.05 per share from the purchasers. Net proceeds to Essex Woodlands were $27,500,000.
>
> After giving effect to the sale, Essex Woodlands continues to own 4,136,802 shares of our common stock. These shares constitute approximately 15 percent of our outstanding common stock, based on 27,584,166 shares of common stock outstanding on October 31, 2005. Essex Woodlands may offer and sell such shares from time to time pursuant to the prospectus.

A true and correct copy of this Supplement is appended to this FAC as Exhibit F.

<u>**Hewitt's December 31, 2005 Notice of Dispute to Health Grades**</u>

56.     On December 31, 2005, the final day of the evaluation period and the deadline

under the Hewitt Contract for Hewitt to "make a determination in writing as to whether or not

Health Grades was successful in providing [the] Pilot Services," Hewitt sent Health Grades a

letter that Hewitt later claimed constituted notice of termination of the entire agreement. Health

Grades 2005 10-K (Exhibit D) at 21. Health Grades would later deny that the letter terminated

the agreement, but the conclusion is inescapable that the December 31, 2005 letter was, at the

very least, a "notice of . . . dispute" within the meaning of § 21b of the Hewitt Contract. In its

2005 10-K, filed with the SEC on March 31, 2006, Health Grades disclosed that it had filed a

demand for arbitration against Hewitt on March 28, 2006. 2005 10-K (Exhibit D) at 21. Prior to

the filing of that demand, Health Grades and Hewitt were required to follow the Hewitt

Contract's mandatory "Internal Escalation" dispute resolution procedure. Under the express,

unambiguous terms governing that procedure set out in the agreement, that process would have

taken 90 days after the delivery by one party to the other of a notice of dispute. December 31,

2005, the date of Hewitt's letter to Health Grades, was 87 days before March 28, 2006. Hewitt's

December 31, 2005 letter, therefore, if not an outright termination notice as Hewitt claimed, must

surely have been a "notice of . . . dispute" within the meaning of the Hewitt Contract.

57.     The December 31, 2005 notice of dispute informed Health Grades that Hewitt

was dissatisfied with essentially ***all*** of Health Grades' required performance under the Hewitt

Contract. In its 2005 10-K, Health Grades disclosed that Hewitt claimed that "it had the right to

terminate the agreement based on [Health Grades'] performance of ***the pilot services and the***

***Network Tag Services***." 2005 10-K (Exhibit D) at 21 (emphasis added). Hewitt must certainly

have raised these issues in its notice of dispute. There is simply no reason to believe that Hewitt,

a multi-national giant with revenues in the billions and access to the best counsel would have been ambiguous in its December 31, 2005 notice about its complaints about Health Grades' performance, especially given the significance of that date under the Hewitt Contract.

58.    Hewitt's December 31, 2005 notice of dispute could not have come as a surprise to Health Grades. Under § 9b of the Hewitt Contract, the parties were required to meet at least quarterly, and Hewitt was to assess Health Grades' performance on an ongoing basis. Hicks' statement to Anmuth and Lin at the December 2005 meetings that Health Grades had been "working with Hewitt for six months" during the Hewitt Contract's evaluation phase clearly implied that the parties were in far more frequent contact. Hewitt, therefore, must certainly have expressed its dissatisfaction with Health Grades' performance during this "working together" phase, and Hicks and Dodge must have been fully aware of Hewitt's complaints when they made their misrepresentations and omissions at the December meetings.

**Misrepresentations and Omissions in Connection with the Second Tranche**

**1.    Lin's January 13, 2006 Conversation with Conley**

59.    On January 13, 2006, two weeks after Health Grades had received (but not disclosed) Hewitt's December 31, 2005 notice of dispute, Lin spoke on the phone with Conley and again asked about the status of the Hewitt Contract. Conley said that the "pilot" evaluation phase had "gone well" and that Hewitt would "transition" to Health Grades from its prior supplier during that quarter. Conley said nothing about the December 31, 2005 notice of dispute or any of the issues it addressed, about any of the communications between Hewitt and Health Grades that must have preceded that notice, or about the fact that Hewitt and Health Grades had begun the "Internal Escalation" dispute resolution process required under the Hewitt Contract. Conley also said nothing about Hewitt's having allegedly obstructed Health Grades'

performance under the Hewitt Contract during its evaluation phase. As always, Conley also said his information had come by way of Hicks at Health Grades and Pacala at Essex.

60.     These representations were false and misleading. In light of Hewitt's December 31, 2005 notice of dispute and the communications that must have preceded it, the evaluation phase obviously had not "gone well," and Hewitt's "transition" to Health Grades within the next several weeks was highly unlikely. Moreover, Conley's misrepresentations and omissions are attributable to all three Defendants. MDB made the misrepresentations and omissions directly, through Conley. Conley said his information had come from Health Grades through Hicks and from Essex through Pacala. Moreover, Conley, *i.e.*, MDB, was acting as Essex's agent in making the misrepresentations. All three defendants are likewise chargeable with knowledge of the falsity of Conley's misrepresentations or at least reckless failure to ascertain the truth, and hence acted with the requisite scienter. Health Grades and Hicks, and Essex through Pacala, the purported sources of the information, were at all times on the front line of the implementation of the Hewitt Contract and the dispute with Hewitt, and, in light of the December 31, 2005 notice of dispute and the communications that must have preceded it, knew that the pilot services had not "gone well" and that Hewitt's "transition" to Health Grades during the first quarter of 2006 was extremely unlikely. Indeed, Hewitt had expressed its dissatisfaction with essentially all of Health Grades' required performance under the Hewitt Contract, *i.e.,* Health Grades' performance of both the Pilot Services and the Network Tag Services. For its part, MDB had an ongoing duty to the investing public to verify the information it disseminated, and at the very least, recklessly failed to do so. As a Health Grades insider looking to liquidate its position, Essex had the same duty.

### 2.   Health Grades' January 18, 2006 Press Release

61.     On January 18, 2006, almost three weeks after receiving Hewitt's December 31, 2005 notice of dispute, Health Grades filed a Form 8-K that included a press release as an exhibit. A true and correct copy of this press release is appended to this FAC as Exhibit G. The press release stated in pertinent part:

> Hewitt has advised Health Grades that it currently believes Health Grades will ultimately perform the services called for by the Agreement, but it will take a longer period of time before Health Grades will be able to do so. Hewitt has called for a one year extension of the evaluation period, together with certain modifications of the Agreement.

> Health Grades believes it has fulfilled all of its requirements with respect to the pilot services and the Network Tag Services during the initial evaluation period. Health Grades is currently engaged in discussions with Hewitt as to appropriate actions to be taken by the parties. Health Grades' previous forecasts regarding revenues under the Agreement may be subject to modification depending on the outcome of Health Grades' discussions with Hewitt.

62.     The representations regarding the status of the Hewitt Contract in the January 18, 2006 press release were false, or at the very least, materially misleading, and Defendants must certainly have known this when the representations were made. The press release also omitted much material information. Health Grades had received Hewitt's notice of dispute nearly three weeks before and, as already explained, that notice must certainly have laid out all of Hewitt's complaints about Health Grades' performance. In fact, given that, as Hicks told Lin and Anmuth at the December 2005 meetings, Health Grades had been "working with Hewitt for six months" by December 2005, and in light of the Hewitt Contract's requirements that the parties meet periodically to assess the status of the agreement's implementation and that Hewitt assess Health Grades' performance on an ongoing basis, Hewitt must have expressed its grievances with Health Grades' performance before sending the written notice. Moreover, by no later than January 15, 2006, three days before the press release was issued, Health Grades was required to

have served Hewitt with its response to Hewitt's December 31, 2005 notice of dispute under §
21b of the Hewitt Contract. Yet Health Grades' January 18, 2006 press release includes not a
word about either Hewitt's December 31, 2005 notice of dispute, the communications that must
have preceded it, or Health Grades' required January 15, 2006 response. In fact, it neither uses
the word "dispute," nor does it reveal that the parties had embarked upon a dispute resolution
process that, under the Hewitt Contract, could (and ultimately did) culminate in arbitration and
loss of the Hewitt deal. Additionally, the press release provides no information at all concerning
the nature of Health Grades' dispute with Hewitt which, as explained above, Health Grades must
surely have known to be very serious, and to involve essentially all of Health Grades'
performance under the Hewitt Contract. The press release also says nothing at all about Hewitt's
alleged obstruction of Health Grades' performance during the evaluation period. In short, Health
Grades' dispute with Hewitt was patently far more serious than the January 18, 2006 press
release let on, and Defendants must have known that at the time.

63.     All of these misrepresentations and omissions were material. That Health Grades
was involved in a "dispute" with Hewitt and had begun a "dispute resolution" process that, under
the Hewitt Contract could (and ultimately did) result in arbitration and the loss of the Hewitt deal
would have been a highly significant piece of information in the total mix of data available to the
investing public. The same is true of the press release's omission of any mention of the facts that
Hewitt had been dissatisfied with Health Grades' entire performance and that Health Grades'
believed that Hewitt had obstructed that performance.

64.     All three Defendants had the requisite scienter with respect to the
misrepresentations and omissions in the January 18, 2006 press release for the reasons already
described. Health Grades had received Hewitt's December 31, 2005 notice of dispute, which

certainly laid out Hewitt's complaints about essentially all of Health Grades' performance under the Hewitt Contract during the evaluation phase–both the Pilot Services and the Network Tag Services. Indeed, given the communication between Health Grades and Hewitt during the evaluation period, Health Grades must have been aware of Hewitt's complaints long before receiving the December 31, 2005 notice of dispute. Health Grades obviously knew of its own position that Hewitt had obstructed its performance. Moreover, Health Grades had by this time responded to that notice and was no doubt in discussions with Hewitt regarding the parties' dispute. Essex was aware of all of this by virtue of its seat on Health Grades' board. MDB had the same knowledge as the entity representing Essex in its sales of HGRD and, as Essex' agent and as an investment banker and registered broker-dealer, had an ongoing duty to ensure that information disseminated to the investing public was accurate, and to correct any inaccurate information that had already been disseminated, *e.g.,* Conley's prior omissions and false representations to Plaintiffs regarding the status of the Hewitt Contract.

### 3.   Lin's January 18, 2006 Conversation with Conley

65.    On January 18, 2006, after Health Grades had issued its press release, Lin spoke with Conley on the phone. Lin asked Conley about the status of the Hewitt Contract in light of Health Grades' press release, and Conley stated that the parties had not yet "signed" for full implementation, but that this was only because Hewitt was undergoing lay-offs and had recently installed a new CFO. Conley said that Health Grades had fulfilled all of its obligations under the Hewitt Contract and was organized for its full implementation, which Conley assured Lin would begin mid-first quarter 2006. Conley said nothing about the December 31, 2005 notice of dispute or the fact that Health Grades and Hewitt were engaged in the Hewitt Contract's mandatory "Internal Escalation" dispute resolution process. Conley also said nothing about Hewitt's having

allegedly obstructed Health Grades' performance under the Hewitt Contract during the
evaluation phase. Conley again said this information had come by way of Hicks at Health Grades
and Pacala at Essex.

66.     These omissions and misrepresentations were made with the requisite scienter and
were knowingly false when made, on the part of MDB, Health Grades, through Hicks, and Essex
through Pacala and as MDB's principal, for the same reasons as were the statements regarding
the status of the Hewitt Contract in the January 18, 2006 press release. By this point, there is
simply no way that all three Defendants would not have known that there were severe problems
with the full implementation of the Hewitt Contract, and that Hewitt, which had the right to
unilaterally terminate the Hewitt Contract, had taken the position that Health Grades'
performance, essentially *in toto*, had been unacceptable. Conley's omissions and
misrepresentations were material for the reasons already described.

### 4.     Lin's January 20, 2006 Breakfast Meeting with Loughran

67.     On January 18, 2006, Loughran, Health Grades' Executive Vice President for
Provider Services, sent an email message to Lin in advance of a breakfast meeting scheduled for
January 20, 2006 in San Francisco. The primary purpose of the meeting was for Lin to introduce
Loughran to Ed Schaffer ("Schaffer") of Intuit, Inc. ("Intuit") so that Schaffer and Loughran
could discuss a possible business alliance between Health Grades and Intuit. Loughran attached
to her January 18, 2006 email message a 15-page document dated January 16, 2006 and titled
"Health Grades Company Overview." This "Company Overview" made no mention of the
Hewitt Contract or the parties' dispute under that agreement.

68.     After breakfast, Schaffer left and Lin and Loughran walked together for a time.
Lin asked Loughran about the status of the Hewitt Contract, and Loughran replied that

everything was fine, that there was no problem, and that the issues between Hewitt and Health Grades were purely "logistical" ones having to do only with the Network Tag Services. Loughran said the Network Tag issue was simply a question of manpower–getting enough people on the job to collect the "tag" information from providers, and that these little wrinkles would soon be ironed out. Loughran said nothing about the fact that Hewitt's complaints were not limited to Health Grades' performance of the Network Tag Services, but also addressed the far broader and more substantive Pilot Services as well. She also said nothing about the December 31, 2005 notice of dispute, the communications that must have preceded it, or the fact that Health Grades and Hewitt were engaged in the Hewitt Contract's mandatory "Internal Escalation" dispute resolution process. Loughran also failed to mention Health Grades' position that Hewitt had obstructed its performance under the Hewitt Contract during the evaluation phase.

69.     These omissions and misrepresentations were false and were made with the requisite scienter. They were false for the same reasons described above with respect to the January 18, 2006 press release and Conley's January 18, 2006 omissions and misrepresentations to Lin. They were knowing, or at least reckless, because, having participated in the December 9, 2005 meeting with Lin, Hicks, Dodge and Conley, and by virtue of her position as Health Grades' Executive Vice President of Provider Services, Loughran was clearly "in the loop" with respect to the Hewitt Contract, which was all about provider services. Moreover, even if Loughran was ignorant of the true status of the Hewitt Contract, she had a duty to say so. By responding in a knowledgeable way, however, she became a spokesperson for Health Grades, and Health Grades is responsible for the inaccuracy of her statements. Loughran's omissions and misrepresentations were material for the reasons already described.

### 5.   Hausman's January 30, 2006 Conversation with Dodge

70.     On January 30, 2006, Joel Hausman ("Hausman"), a principal of Willow Creek, spoke on the telephone with Dodge, Health Grades' CFO. With respect to the status of the Hewitt Contract, Dodge said that there were minor issues with the performance of the Network Tag Services, but that these issues would be resolved within 3 to 5 weeks, followed by full implementation. Dodge did not disclose Hewitt's December 31, 2005 notice of dispute. In fact, he did not once use the word dispute, and did not reveal that Health Grades and Hewitt were engaged in the Hewitt Contract's mandatory dispute resolution procedure, which could (and ultimately did) culminate in arbitration and loss of the Hewitt deal. Nor did he mention that Hewitt was dissatisfied with Health Grades' performance not only of the Network Tag Services, but of the Pilot Services as well, or that Hewitt, in Health Grades' view, had obstructed that performance during the evaluation phase of the Hewitt Contract.

71.     Dodge's representations were false when made. Hewitt's complaints under the Hewitt Contract were not limited to the Network Tag Services–they concerned Health Grades' entire performance under the Hewitt Contract, including the far more complicated and extensive Pilot Services. Dodge, as Health Grades' CFO and one of its designated "Authorized Representatives" under the Hewitt Contract was certainly aware of this, and of also of Hewitt's alleged obstruction of Health Grades' performance under the Hewitt Contract during the evaluation phase. These misrepresentations and omissions were material for the obvious reasons already explained.

### 6.   Lin's January 31, 2006 Conversation with Conley

72.     In a telephone conversation on January 31, 2006, Conley told Lin that he, Conley, would be participating in MDB's "roadshow" for the Essex' second tranche of HGRD

on February 22, 2006. Conley again did not disclose any of the difficulties between Health Grades and Hewitt. This was a knowing omission attributable to all three Defendants for the reasons discussed above with respect to Conley's January 18, 2006 conversation with Lin. It was material for the reasons already described.

### 7.   Anmuth's Conversations with Hicks

73.     Between the issuance of the January 18, 2006 press release and Essex' second tranche on February 27, 2006, Anmuth had two telephone conversations with Hicks. In each conversation, Anmuth asked Hicks about the status of the Hewitt Contract in light of the January 18, 2006 press release. Each time, Hicks reassured Anmuth that all was well–that the issues were logistical and related only to the Network Tag Services, and that full implementation of the Hewitt Contract was taking longer than expected, but was nonetheless assured. Hicks said nothing in either conversation about the December 31, 2005 notice of dispute, the communications that must have preceded it, the fact that Health Grades and Hewitt were engaged in the Hewitt Contract's mandatory "Internal Escalation" dispute resolution process, or the fact that Hewitt was dissatisfied with Health Grades' entire performance under the Hewitt Contract, *i.e.*, its performance of both the Pilot Services and the Network Tag Services. Hicks likewise said absolutely nothing about Hewitt having obstructed Health Grades' performance of the Hewitt Contract during the evaluation phase.

74.     These misrepresentations were false when made, the misrepresentations and omissions were made with the requisite scienter, and were material for the same reasons described in connection with each of the other second tranche misrepresentations discussed above.

### 8.   **Hausman's February 10, 2006 Meeting with Loughran**

75.     On February 10, 2006, Hausman and Joshua Fisher ("Fisher") of Pequot Capital Management, LLC, at the time a joint venture partner of Willow Creek, met Loughran at a restaurant called Giorgio's in Greenbrae. Loughran told Hausman and Fisher that the issues related to the Hewitt Contract concerned only the Network Tag Services, and she gave no indication that there were any serious issues that would long delay full implementation of the Hewitt Contract. Loughran said nothing to Fisher or Hausman about Hewitt's December 31, 2005 notice of dispute, the communications that must have preceded it, or the fact that Hewitt and Health Grades were engaged in the Hewitt Contract's mandatory dispute resolution procedure which could (and did) culminate in arbitration and loss of the Hewitt deal. Nor did she mention Hewitt's having obstructed Health Grades' performance during the Hewitt Contract's evaluation phase.

76.     These representations were knowingly or at least recklessly false, and the misrepresentations and omissions were material and made with the requisite scienter for the same reasons as were those Loughran made to Lin after the January 20, 2006 breakfast meeting.

### 9.   **Hicks Dodges Lin**

77.     During the first half of February 2006, Lin made several attempts to contact Hicks to discuss the Hewitt Contract, but was usually told that Hicks was unavailable. For example, as confirmed in an email from Hicks to Lin of February 12, 2006, Lin left a voice mail message for Hicks on February 9, 2006. In his email, Hicks promised to call Lin on Monday, February 13, 2006. When Hicks hadn't called by Wednesday, February 15, 2006, Lin sent Hicks an email stating, "still waiting for your call when you're free." Instead of calling Lin as he had promised, Hicks sent Lin an email message on February 16, 2006 stating that a trip Hicks had planned to

New York and Boston was "in flux." On each of the few occasions when Lin did manage to

reach Hicks by phone during this period, Lin asked Hicks about the status of the Hewitt Contract.

Hicks' response was always the same–the issues between the parties were "logistical" or had to

do with "manpower" and concerned only the Network Tag Services, and full implementation of

the Hewitt Contract would begin soon. Hicks never used the word dispute, never revealed that

Health Grades and Hewitt were engaged in a mandatory dispute resolution process under the

Hewitt Contract, and never mentioned that Hewitt had been dissatisfied not only with Health

Grades' performance of the Network Tag Services, but with its performance of the Pilot Services

as well. Hicks also said nothing about Hewitt's allegedly having obstructed Health Grades'

performance of the Hewitt Contract during the evaluation phase.

> 78.    These representations were false when made, and the misrepresentations and

omissions were material and made with the requisite scienter for the same reasons already laid

out above with respect to the other second tranche misrepresentations and omissions.

## 10.    The February 21, 2006 Health Grades 4Q Conference Call

> 79.    On February 21, 2006, Health Grades conducted a "Fourth Quarter Earnings and

Year-End Results" conference call, in which Lin, Anmuth, and Hausman participated. A true and

correct copy of the transcript of this call is appended to this FAC as Exhibit H. During this call,

Hicks stated:

> We are continuing diligently with our discussions with Hewitt, point of fact every
> week, with respect to both parties' responsibilities under the agreement as we
> mutually are committed to working together and collaboratively to move this
> agreement forward; no modifications to the agreement, including any extensions
> of [the evaluation] period, has [sic] been agreed to at this time. If our discussions
> result in any significant modifications to the agreement, obviously we will
> disclose those as soon as we have those available. . . ..

> Looking ahead, I would like to reiterate our 2006 revenue and operating margin
> forecasts. We are currently targeting at least 40% revenue growth over 2005, an
> operating margin of approximately 25% in 2006. Health Grades expects its 2006

revenue growth and operating margins to be higher in the second half of this year compared to the first half as the company continues to invest in a number of strategic initiatives. These initiatives include among other things new product development, the redesign of current employer applications, ***and the company's agreement with Hewitt which I described earlier.***

February 21, 2006 Transcript (Exhibit H) at 4 (emphasis added).

80.     Hicks' statements during the February 21, 2006 conference call painted a positive, but entirely false, picture of the status of the Hewitt Contract. Both parties, he said, were committed to making the agreement work and were "working together and collaboratively" towards that end. Indeed, it did not even look as if the evaluation period would have to be extended after all or that any "significant modifications" to the agreement would be required. In fact, things were proceeding so smoothly towards a resolution with Hewitt that Health Grades was not altering its expectation of "at least 40% revenue growth over 2005," and was projecting that growth, as well as operating margins, to be higher during the second half of 2006 at least in part because of the Hewitt Contract. Indeed, the outlook appeared brighter now than it had when Health Grades issued its January 18, 2006 press release. ***Then***, Health Grades had said that "previous forecasts regarding revenues under the [Hewitt Contract] may be subject to modification depending on the outcome of Health Grades' discussions with Hewitt." January 18, 2006 Press Release (Exhibit G). ***Now***, 7 weeks into discussions with Hewitt, Health Grades was saying it was sticking with its forecasts.

81.     The real situation, however, was quite different, and all three Defendants knew it. As already explained, Hewitt's December 31, 2005 notice of dispute and the communications that must have preceded it undoubtedly had put Health Grades on notice of Hewitt's many serious complaints with Health Grades entire performance under the Hewitt Contract. Even if the December 31, 2005 notice of dispute for some reason had not set forth all of Hewitt's grievances, Health Grades must surely have been aware of them by now, 7 weeks later, what with the

discussions between the parties that Hicks stated were going on "diligently" and "every week." Moreover, pursuant to the Hewitt Agreement's mandatory "Internal Escalation" dispute resolution procedure, the parties' dispute was a mere 8 days away from being kicked up to the "senior executive" level, the last stop before arbitration. Yet Hicks neither used the word "dispute," nor did he mention that the parties were engaged in a mandatory dispute resolution process that just over one month later would result in arbitration and loss of the Hewitt deal. He did not breathe a word about the nature or seriousness of Hewitt's complaints, and in fact stated that Health Grades expected revenue growth and operating margins to actually increase in the second half of 2006 because of the Hewitt Contract. Additionally, Hicks said nothing about Health Grades' belief that Hewitt had obstructed Health Grades' performance during the Hewitt Contract's evaluation phase.

82.     The omissions and misrepresentations in the conference call were made with the requisite scienter on the part of Health Grades and Essex. Health Grades, and Essex as a member of Health Grades' board, were surely aware of the true status of the Hewitt Contract at the time the omissions and misrepresentations were made. As Essex' agent, and as an investment banker and registered broker-dealer charged with representing Essex in the upcoming sale of Essex' remaining 4 million shares of HGRD, MDB must also have known the true status of the Hewitt Contract and had an ongoing duty to correct prior misrepresentations and omissions made to Plaintiffs, *e.g.,* Conley's misrepresentations and omissions in his conversations with Plaintiffs. If MDB did not know, then its ignorance constituted actionable recklessness

83.     The omissions and misrepresentations made in the conference call were obviously material. The true status of the Hewitt Contract and Health Grades' serious dispute with Hewitt

would certainly have been an important factor in the total mix of information available to investors concerning Health Grades and its prospects.

### 11.  The Second Tranche Power Point Presentation

84.     In connection with MDB's mid-February "roadshow" for Essex' second tranche, Conley prepared a second Power Point production on Essex' behalf and with the approval of Health Grades' board of directors, including Pacala of Essex. Conley provided this presentation to Anmuth, Lin, and Hausman. This presentation was essentially identical to the first one, except that all references to the Hewitt Contract had been surgically excised.

85.     The deletion of all mention of the Hewitt Contract constituted a material, knowing omission by all three Defendants. As already explained, the status of the Hewitt Contract was highly material to any potential investor's decision as to whether or not to buy HGRD. The deletion of all references to the Hewitt Contract demonstrates Defendants' awareness that the relationship between Health Grades and Hewitt had tipped into the ditch. Also as already explained, Health Grades and Essex had direct knowledge of this, and MDB is chargeable with knowledge by virtue of its relationship with Essex and its status as an investment banker and registered broker-dealer with a duty perform adequate due diligence with respect to an offering it was conducting, and to correct past misrepresentations and omissions. If MDB did not know the truth, then its ignorance was certainly reckless.

### Motive and Opportunity With Respect to the Second Tranche Misrepresentations and Omissions

86.     All three Defendants had the same powerful motives for concealing the true status of the Hewitt Contract with respect to Essex' second tranche that they had with respect to the first tranche. Health Grades had touted the Hewitt Contract for months as a primary revenue driver for the company for the foreseeable future and as its doorway to lucrative payor and

employer business. The company had projected that the Hewitt Contract would generate approximately $4 million in new revenue in 2006, a 20% increase over its annualized revenues reported for the quarter ending June 30, 2005, and $6 million annually beginning in 2007. Hicks and Dodge had met with potential investors like Lin, Anmuth, and Hausman representing how "big" the Hewitt deal was going to be for the company. Health Grades undoubtedly knew that, were it to reveal that the Hewitt Contract was in danger shortly before Essex planned to dump its second, huge tranche of HGRD on the market, a tranche representing 15% of all outstanding shares, HGRD's price would likely plummet. Hicks, who according to Health Grades' 2005 10-K/A, himself owned more than 4 million shares of HGRD, or over 13% of shares outstanding, and Dodge, who owned 2.6%, personally had the same motivation to conceal the severity of Health Grades' dispute with Hewitt. 2005 10-K/A at 7. It remained vital, therefore, for Health Grades, and Hicks and Dodge, to conceal the true nature of Health Grades' dispute with Hewitt at least until Essex had sold all its shares.

87.      Essex obviously still had a strong interest in keeping HGRD's price as high as possible until after it had liquidated its position. Essex certainly knew there was no way it would be able to liquidate its remaining huge position in HGRD at anything a steep discount were the truth concerning the Hewitt Contract disclosed. MDB, as Essex' agent, had the same motivation. Moreover, as MDB told Lin, Essex was willing to sell only at a particular minimum price, and, if that price could not be achieved and Essex did not sell, MDB would receive no commission.

88.      All three Defendants had the opportunity to commit fraud (and did) with respect to the first tranche. Health Grades, through Hicks and Dodge, communicated directly with Plaintiffs. Health Grades also communicated with the investing public through its SEC filings, conference call, and the second Power Point presentation. MDB communicated directly with

Plaintiffs through Conley and through the second Power Point presentation. Essex communicated with Plaintiffs through its agent, MDB and through Health Grades.

**Plaintiffs Purchase HGRD in Essex' Second Tranche**

89.     On February 27, 2006, in reliance upon the misrepresentations and omissions described above, Gotham purchased approximately 150,000 shares of HGRD at $6.05 per share. In addition to its purchases of HGRD on December 19, 2005 and February 27, 2006, Gotham also purchased approximately 300,000 shares of HGRD in other transactions on the open market between December 19, 2005 and May 26, 2006.

90.     On February 27, 2006, in reliance upon the misrepresentations and omissions described above, Partners purchased approximately 110,000 shares of HGRD at $6.05 per share.

91.     On February 27, 2006, in reliance upon the misrepresentations and omissions described above, Offshore Partners purchased approximately 70,000 shares of HGRD at $6.05 per share.

92.     On February 27, 2006, in reliance upon the misrepresentations and omissions described above, Focus purchased approximately 270,000 shares of HGRD at $6.05 per share.

93.     On February 27, 2006, in reliance upon the misrepresentations and omissions described above, Primarius China purchased approximately 250,000 shares of HGRD at $6.05 per share.

94.     On February 27, 2006, in reliance upon the misrepresentations and omissions described above, Willow Creek purchased approximately 35,000 shares of HGRD at $6.05 per share. Willow Creek also purchased additional shares of HGRD on the open market between up until April 3, 2006 (before hearing about the disclosures in Health Grades March 31, 2006 10-K).

95.     Plaintiffs' reliance on Defendants' misrepresentations was entirely reasonable. As detailed above, Health Grades' CEO and CFO, as well as MDB, through Conley, and Essex, through its agent, MDB, and also through Health Grades, had repeatedly assured Plaintiffs that the Hewitt Contract's full implementation was assured and that, because of that, the new revenue that agreement was projected to generate was likewise certain. In and after the January 18, 2006 press release, Plaintiffs were assured repeatedly that the issues between Hewitt and Health Grades were minor, had to do only with the Network Tag Services and not the Pilot Services, and would soon be resolved. Plaintiffs had no reason to doubt the truth of these misrepresentations, having come as they did directly from Health Grades' CEO, from Health Grades' largest shareholder, Essex, through MDB, and from MDB, a purportedly reputable investment banker and registered broker-dealer acting on Essex' behalf. No Plaintiff would have purchased any shares of HGRD had they been told the truth about the Hewitt Contract.

### Post-Second Tranche Misrepresentations and Omissions

**1.      Health Grades Fails to Disclose That Hewitt Has Taken
the Position that the Hewitt Contract Was Terminated**

96.     According to Health Grades' 2005 10-K, filed with the SEC on March 31, 2006, "on March 10, 2006, Hewitt claimed that the December 31, 2005 letter invoked the right to terminate" the Hewitt Contract. 2005 10-K (Exhibit D) at 21. During the February 21, 2006 conference call, Hicks had stated that if Health Grades' discussions with Hewitt "result[ed] in any significant modifications to the agreement, obviously we will disclose those as soon as we have those available." February 21, 2006 Transcript (Exhibit H) at 4. Hewitt's taking the position that the Hewitt Contract has been terminated constituted a "significant modification," and also information that would be highly material to investors. Health Grades, however, made no disclosure until three weeks later. This was an actionable, knowing, material omission.

### 2. Health Grades Fails to Disclose That Hewitt Has Abandoned The Hewitt Contract

97.     In its 2005 10-K, Health Grades also disclosed that, "on March 15, 2006, Hewitt administrators refused to continue to perform Hewitt's obligations under the Agreement." 2005 10-K (Exhibit D) at 21. Again, this was certainly a material development. Health Grades, however, did not disclose it until almost two weeks later, when it filed its 2005 10-K, after 4 p.m., on Friday afternoon, March 31, 2006. This was an actionable, knowing, material omission.

### 3. The March 15, 2006 Investors Meeting

98.     On March 15, 2006, five days after Hewitt had taken the position that its December 31, 2005 notice of dispute had terminated the Hewitt Contract and the very day Hewitt ceased all performance under that agreement, Hausman attended an investors meeting at 101 California Street, Suite 4010, San Francisco conducted by Hicks. Hicks did not disclose the events of March 10 or March 15, 2006 at this meeting. Instead, he repeated what had been Health Grades' party line since the January 18, 2006 press release, saying that the issues with Hewitt were limited to the Network Tag Services. He also stated that the parties were still negotiating and that they would reach a resolution by early summer, which could not possibly have been true, given that Hewitt had ceased performance and taken the position that the Hewitt Contract had been terminated. Hicks' omissions and misrepresentations at this meeting were obviously knowing, and just as obviously material to anyone contemplating the purchase of HGRD.

### The Confessions

### 1. Lin's April 2006 Conversation with Conley

99.     In April 2006, after Health Grades had finally revealed the loss of the Hewitt Contract, Lin spoke with Conley on the phone. During this conversation, Conley told Lin that,

from the beginning, Lin had not been told the truth about the status of the Hewitt Contract, and that Essex and Health Grades had at all times known far more than they were disclosing publicly.

### 2.   Anmuth's June 2006 Conversation with Dodge

100.   In mid-June 2006, Anmuth spoke with Dodge on the phone. Angry about having been deceived about the Hewitt Contract, Anmuth told Dodge that investors now knew that they had been deceived, and accused Dodge and Health Grades of having known from their first meeting in December 2005 that the Hewitt Contract was in serious jeopardy. Rather than challenging Anmuth's accusations, Dodge simply said, "OK, OK, OK." Dodge's last words in the conversation were, "I hope things turn out well for you guys."

### Plaintiffs' Losses

101.   On March 31, 2006, HGRD closed at $5.15. On the same date, after the markets had closed, Health Grades filed its 2005 10-K, in which it disclosed for the first time: (1) that, on December 31, 2005, it had received Hewitt's notice of dispute; (2) that, on March 10, 2006, Hewitt had notified Health Grades that it regarded the December 31, 2005 notice as a notice of termination of the Hewitt Contract; (3) that, on March 15, 2006, Hewitt had ceased all performance under the Hewitt Contract; (4) that Health Grades had filed for arbitration against Hewitt on March 28, 2006; (5) that it was Hewitt's position that Health Grades had failed to adequately perform both the Network Tag Services and the Pilot Services during the Hewitt Contract's evaluation phase; and (6) that, in Health Grades' view, Hewitt had obstructed Health Grades' performance under the Hewitt Contract during the evaluation phase.

102.   On April 3, 2006, the next trading day, because of Health Grades' disclosures concerning the Hewitt Contract, HGRD fell by more than 21%, closing at $4.05. By June 21, 2006, because of Health Grades' loss of the Hewitt Contract, HGRD had fallen to $2.95.

103.     Willow Creek sold approximately 85,000 shares of HGRD on April 3, 2006,
incurring great losses. By the end of June 2006, Willow Creek had substantially liquidated the
remainder of its HGRD position, also at great loss.

104.     Gotham had also substantially liquidated its HGRD position by the end of June
2006, incurring great losses.

105.     The Primarius Funds and their limited partners incurred losses in two ways. First,
limited partners who withdrew from those funds in the several months following Health Grades'
March 31, 2006 disclosures received less than they otherwise would have due to the diminution
in the value of the Primarius funds' HGRD holdings caused by the loss of the Hewitt Contract.
Second, like the other Plaintiffs, the Primarius funds had largely liquidated their HGRD positions
by the end of 2006, incurring great losses.

## Causation

### 1.   Transaction Causation

106.     As already alleged, no Plaintiff would have purchased any shares of Health
Grades but for Defendants' fraud. Transaction causation thus exists for all of Plaintiffs' losses.

### 2.   Loss Causation

107.     After Health Grades' March 31, 2006 disclosure, HGRD immediately lost more
than 21% of its value. HGRD did not recover from the blow of the loss of the Hewitt Contract
during 2006. In fact, in a November 1, 2006 press release, Health Grades announced that it was
formally reducing its 2006 projections, citing failure of the Hewitt Contract as a major factor. A
true and correct copy of this press release is appended to this FAC as Exhibit I. The press release
stated, *inter alia*, "we have been challenged throughout the year to overcome what we had
anticipated to be an incremental $3.5 million in revenue from an expanded relationship with

Hewitt," adding that "[o]ur expenses for the quarter have increased more than anticipated as a result of ongoing arbitration legal fees," among other things.

108.    Defendants' misrepresentations and omissions concerning the Hewitt Contract caused Plaintiffs to purchase HGRD. The value of HGRD plummeted because of Health Grades' loss of the Hewitt deal, and because of its belated disclosure of that loss. Defendants' fraud, therefore, proximately caused Plaintiffs' losses, and loss causation consequently exists.

**COUNT I**

**Section 10(b) of the Exchange Act and Rule 10b-5**

(Against All Defendants)

109.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 108 above, as if fully set forth herein.

110.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, and by use of a means or instrumentality of interstate commerce, the mails or a facility of a national securities exchange, have:

(a)    employed a device, scheme or artifice to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices and/or courses of business which operated or would operate as a fraud or deceit upon any person.

111.    As a direct and proximate result, Plaintiffs, and each of them, have suffered damages in an amount to be determined at trial.

## COUNT II

### Section 12(a) of the Securities Act

(Against All Defendants)

112.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 111 above, as if fully set forth herein.

113.    Defendants, and each of them, by engaging in the conduct described above, directly and indirectly, by the use of means and/or instruments of transportation and/or communication in interstate commerce and/or of the mails, have:

> (a)    offered and or sold a security;
>
> (b)    by means of a prospectus and/or oral communication;
>
> (c)    which included untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, and with respect to which Plaintiffs did not know of such untruth or omission.

114.    Each Defendant was a "seller" with respect to Essex' sales of its HGRD shares. Essex was the direct seller. Health Grades and MDB were sellers because they each solicited Plaintiffs to make their purchases of HGRD and they each benefited from the misrepresentations and omissions they made in connection with those purchases and from the purchases. Health Grades benefited by maintaining the value of HGRD, and hence of the company, at an inflated level. MDB benefited by earning substantial commissions on Plaintiffs' purchases.

115.    Essex' sales of its HGRD shares constituted a public offering for purposes of Section 12(a).

116.    Essex sold its HGRD shares pursuant to Health Grades' prospectus of May 12, 2005, and each of the misrepresentations and omissions at issue in this FAC was made in connection with that prospectus.

117.    As a direct and proximate result of Defendants' conduct in violation of Section 12(a), Plaintiffs, and each of them, have suffered damages in an amount to be determined at trial.

## COUNT III

## Fraud

### (Against All Defendants)

118.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 117 above, as if fully set forth herein.

119.    As described herein, Defendants and each of them made numerous material misrepresentations with knowledge of their falsity or with reckless disregard for the truth, and/or numerous knowing, intentional omissions of material fact to Plaintiffs with the intention of inducing Plaintiffs to rely upon such misrepresentations and/or omissions. Plaintiffs reasonably relied upon these misrepresentations and omissions and, as a direct and proximate result, suffered great damage.

## COUNT IV

## Negligent Misrepresentation

### (Against All Defendants)

120.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 119 above, as if fully set forth herein.

121.    Each Defendant owed each Plaintiff a duty not to make false representations or omissions in their dealings. Health Grades' duty arose from the fact that Plaintiffs were shareholders of Health Grades at the times when the misrepresentations and omissions at issue were made. Health Grades also acquired a duty not to make false representations or omissions in its dealings with Plaintiffs when it took it upon itself to meet with Plaintiffs and directly provide to them information relevant to the Hewitt Contract and to Essex' sales of its shares of HGRD. Finally, Health Grades had a statutory duty not to make misrepresentations or omissions in its filings with the SEC or otherwise in its disclosures to the investing public.

122.    Essex had a duty not to make misrepresentations and omissions to Plaintiffs in connection with its sales of its HGRD shares because of its status as a Health Grades insider and by virtue of its holding a seat on Health Grades' board of directors.

123.    MDB had a duty not to make misrepresentations and omissions to Plaintiffs in connection with Essex' sale of its HGRD shares for the same reasons as did Essex because it was at all times acting as Essex' agent. MDB also had a duty not to make such misrepresentations and omissions as an investment banker and registered broker-dealer, and by taking it upon itself to provide information to Plaintiffs regarding the Hewitt Contract and in connection with Essex' sale of its HGRD shares.

124.    Each Defendant made the misrepresentations and omissions described herein in breach of the duties they owed Plaintiffs. Each Defendant made each of the misrepresentations described herein knowing of the misrepresentation's falsity, or with reckless disregard for those misrepresentations' truth.

125.     Each Defendant made each misrepresentation or omission knowing and intending that Plaintiffs would reasonably rely upon such misrepresentations and omissions, and with the intent that Plaintiffs do so.

126.     Plaintiffs reasonably relied upon these misrepresentations and omissions and, as a direct and proximate result, suffered great damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Awarding Plaintiffs compensatory damages, together with appropriate pre-judgment interest at the maximum rate allowable by law;

B.     Awarding Plaintiffs punitive damages with respect to Count III;

C.     Awarding Plaintiffs their costs and expenses for this litigation, including reasonable attorney's fees, expert fees and other disbursements; and

D.     Awarding Plaintiffs such other relief as might be deemed just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury as to all issues so triable.

*[Signatures appear on next page.]*

Dated:   New York, New York
         August 20, 2007

                               FAGELBAUM & HELLER LLP

                               s/ Philip Heller

By:   _____
       Philip Heller (PH-7798)
       2049 Century Park East, Suite 4250
       Los Angeles, California 90067
       (310) 286-7666

       - and -

       AKERMAN SENTERFITT LLP

       s/ Martin Domb

By:   _____
       Martin Domb (MD-4109)
       335 Madison Avenue, 26th Floor
       New York, New York 10017
       (212) 880-3800

       Attorneys for Plaintiffs

**<u>Certificate of Service</u>**

I hereby certify that on this 20th day of August, 2007, I caused true copies of the foregoing First Amended Complaint to be served on the following counsel for defendants both (1) by e-mail, and (2) by hand delivery, at their respective addresses as follows:

> Pepper Hamilton, LLP (NY)
> 420 Lexington Avenue
> Suite 2320
> New York, NY 10170
> Attn:  Kenneth J. King, Esq.
> Email: kingk@pepperlaw.com
>
> McDermott, Will & Emery, LLP (NY)
> 340 Madison Avenue
> New York, NY 10017
> Attn:  Leila Rachele Pittaway, Esq.
> Email: lpittaway@mwe.com
>
> Cooley Godward Kronish LLP
> 1114 Avenue of the Americas
> New York, NY 10036
> Attn:  Alan Levine, Esq.
> Email: alevine@cooley.com

s/ Martin Domb

_____

Martin Domb (MD-4109)